**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ABHISHEK NANDA,**<br><br>42 S 15th St., Apt 901<br>Philadelphia, PA 19102<br><br>**Plaintiff,**<br><br>**v.**<br><br>**JOSEPH B. EDLOW, Director, U.S. Citizenship and Immigration Services (USCIS),**<br><br>5900 Capital Gateway Drive<br>Camp Springs, MD 20588-0009<br>Prince George's County<br><br>**Defendant.** | **Case No. 2:26-cv-8202**<br><br>**CIVIL COMPLAINT** |

**COMPLAINT**

Plaintiff Abhishek Nanda files this civil action seeking declaratory and injunctive relief under the Administrative Procedure Act (APA) to set aside the U.S. Citizenship and Immigration Services' (USCIS) decision denying his immigrant visa petition (Form I-140) for classification as a first preference employment-based immigrant (EB-1) of extraordinary ability.

Mr. Nanda is a highly accomplished professional in the field of technology investments and corporate development who has successfully closed investments in and acquisitions of leading companies with a cumulative value of more than $5 billion and which have leveraged the investments to deliver innovative products and services

to U.S. and global customers. Specifically, over more than a decade, his work has spanned technology private equity investing at Partners Group and technology corporate development, including mergers and acquisitions (M&A) and strategy, at Advantive, Revalize, and Microsoft. He earned a Bachelor of Engineering degree from Nanyang Technological University in Singapore in 2012 and an M.B.A. from Harvard Business School in 2019. He began his career at Microsoft first working as a Software Engineer from 2013 to 2014 and then as a Corporate Strategy and Development Manager from 2014 to 2017. After his M.B.A., he worked from 2019 to 2023 as a technology investment professional at Partners Group and from 2024 to 2025 as a Senior Corporate Development Manager at Revalize. Currently, he is driving global corporate development activities at Revalize's sister company, Advantive, a leading U.S. manufacturing software company serving more than 6,500 customers in 88 countries including the U.S.

Mr. Nanda submitted comprehensive documentary evidence to USCIS highlighting his professional achievements. This included membership in qualifying associations, published material about him, participation as a judge of the work of others, original business-related contributions of major significance, authorship of scholarly articles, leading or critical roles for distinguished organizations, and high salary or other significantly high remuneration in relation to others in the field. The evidence underscored his advanced and pioneering work in the domain of technology investments and corporate development.

Mr. Nanda has been admitted into the highly selective Forbes Finance Council; featured as the subject of published material in media outlets including MSN.com, TechBullion.com, NYTech/Benzinga.com, and DNAIndia.com (several of which reach millions of readers); authored articles in outlets including Forbes and Hackernoon; and participated in judging or review activity through SARC Council and IRJEMS. After considering his response to the agency's request for additional evidence, USCIS found that he satisfied four regulatory criteria: membership, published material, judging, and authorship.

The evidence submitted by Mr. Nanda also described his work for recognized organizations including Microsoft, Partners Group, Revalize, and Advantive, and presented his professional background as involving technology investments, corporate development, and evaluation of emerging and commercially significant technology trends. As reflected in the record, Mr. Nanda's background combines rigorous technical training, business education, and investment experience across distinguished organizations.

Despite this record, USCIS denied Mr. Nanda's petition even after expressly finding that he satisfied four regulatory criteria, more than the three required to proceed beyond the threshold evidentiary showing. The agency also rejected his claims relating to leading or critical role, original contributions of major significance, and high remuneration, without meaningfully engaging the extensive documentary and testimonial evidence submitted in support of those criteria.

The errors became even more pronounced at the final-merits stage. Rather than evaluating the record holistically, USCIS treated the evidence in a piecemeal fashion, discounted evidence it had already accepted, and imposed requirements not found in the INA, the regulations, or any duly promulgated rule, including unsupported recency and corroboration demands. The decision is also internally inconsistent because after finding that Mr. Nanda had established membership, published material, judging, and authorship, USCIS later asserted that he had not documented those very categories of evidence as part of sustained acclaim. It likewise failed to account for probative evidence that remained relevant to final merits regardless of whether USCIS formally counted additional criteria. Together, these errors show that the agency did not conduct the reasoned, record-based adjudication required by law and instead denied the petition through a framework that was inconsistently applied, legally flawed, and untethered from the administrative record.

Mr. Nanda challenges both USCIS's treatment of his individual record and its adoption and use of the final-merits framework through subregulatory guidance without notice-and-comment rulemaking. He accordingly asks the Court to set aside the denial under 5 U.S.C. §§ 702 and 706(2) and grant appropriate relief.

## PARTIES

1. Mr. Nanda is a citizen and national of India residing in Philadelphia, Pennsylvania. He filed an immigrant visa petition (Form I-140) for classification as

an employment-based immigrant of extraordinary ability with USCIS on April 16, 2025, but on July 18, 2025, the agency denied the petition.[1]

2. Defendant Joseph B. EDLOW is the Director of USCIS. Director Edlow has authority to direct and oversee USCIS's processing and adjudicating immigrant visa petitions filed by foreign nationals seeking classification as an employment-based immigrant of extraordinary ability. *See* 6 U.S.C. § 271(b)(1); 8 U.S.C. § 1153(b)(1)(A). Director Edlow maintains an office at the headquarters of USCIS located in Camp Springs, Maryland. Director Edlow is sued in his official capacity.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1331. *See Califano v. Sanders*, 430 U.S. 99, 106 (1977).

4. The United States has waived sovereign immunity over claims, other than relief seeking money damages, relating to agency action or inaction from which a person has suffered a legal wrong. *See* 5 U.S.C. § 702.

5. This Court is authorized to review agency action under the Administrative Procedure Act ("APA"). *See* 5 U.S.C. §§ 702, 704.

---

[1] Although the 2025 EB-1A petition bears its own filing-based priority date, Mr. Nanda is also the beneficiary of a previously approved Microsoft EB-3 Form I-140 with an April 27, 2016 priority date. He requested retention of that earlier date under 8 C.F.R. § 204.5(e). The Microsoft petition was approved on November 18, 2016, and Microsoft did not withdraw it until May 2, 2018, more than 180 days after approval; it therefore remained approved notwithstanding the withdrawal absent revocation on another ground. *See* 8 C.F.R. § 205.1(a)(3)(iii)(C). If the challenged EB-1A petition is approved, Mr. Nanda would be entitled to retain and use the April 27, 2016 priority date, subject to the exceptions in 8 C.F.R. § 204.5(e)(2).

6. USCIS's decision denying Mr. Nanda's immigrant visa petition constitutes a final agency action under the APA. *See* 5 U.S.C. § 704.

7. Under the APA, this Court is authorized to set aside agency action that is unlawful, including actions that are arbitrary and capricious or contrary to law, or adopted without observance of procedure required by law. *See* 5 U.S.C. § 706(2)(A)—(E).

8. This Court is authorized to issue orders for declaratory and injunctive relief in connection with challenges to an agency's action under the APA. *See* 5 U.S.C. § 703; 28 U.S.C. § 2201.

9. Neither the statute nor the regulation requires an administrative appeal of a decision denying an employment-based immigrant visa petition. *See* 8 U.S.C. §§ 1153(b)(1)(A), 1154(b); 8 C.F.R. § 204.5(n)(2). Mr. Nanda has exhausted all required administrative remedies. *See Darby v. Cisneros*, 509 U.S. 137 (1993).

10. Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(C) as Mr. Nanda resides in this jurisdiction and no real property is at issue in the case.

11. Mr. Nanda suffered and continues to suffer ongoing harm from USCIS's denial of his EB-1A petition. Without approval of this petition, Mr. Nanda cannot pursue permanent residence through this EB-1A classification and cannot obtain the immigration benefits that would flow from approval of this petition. A favorable ruling setting aside the denial and requiring lawful adjudication would redress those injuries.

## STATUTORY AND REGULATORY BACKGROUND

12. The Immigration and Nationality Act ("INA") provides for the classification of foreign nationals seeking admission to the United States based on their "extraordinary ability in the sciences, arts, education, business, or athletics which has been demonstrated by sustained national or international acclaim and whose achievements have been recognized in the field through extensive documentation." Immigration Act of 1990, Pub. Law No. 101-649, § 121(a) (Nov. 29, 1990) (codified at 8 U.S.C. § 1153(b)(1)(A)(i)).

13. USCIS is authorized to adjudicate immigrant visa petitions to classify foreign nationals under the extraordinary ability category. *See* 6 U.S.C. § 271(b)(1). The statute provides, however, that "[a]fter an investigation of the facts in each case" the Secretary of Homeland Security "shall, if he determines that the facts stated in the petition are true and the alien in behalf of whom the petition is made . . . is eligible for preference" under Section 1153(b), approve the petition. 8 U.S.C. § 1154(b).

14. A foreign national may self-petition for classification under the extraordinary ability category by filing a Form I-140 petition with USCIS. *See* 8 U.S.C. § 1154(a)(1)(E); 8 C.F.R. § 204.5(h)(1). If USCIS approves an immigrant visa petition, the foreign national may use the approved petition to apply for adjustment of status to a lawful permanent resident if he has already been admitted and is physically present in the United States. *See* 8 U.S.C. § 1255(a); 8 C.F.R. §§ 204.5(n)(1), 245.1(a).

15. The statute does not define "extraordinary ability." *See* 8 U.S.C. §§ 1101(a), 1153(b)(1)(A).

16. In 1991, legacy Immigration and Naturalization Service issued a rule defining extraordinary ability to mean "a level of expertise indicating that the individual is one of that small percentage who have risen to the very top of the field of endeavor." 56 Fed. Reg. 60,897, 60,906 (Nov. 29, 1991) (codified at 8 C.F.R. § 204.5(h)(2)).

17. To meet the definition of extraordinary ability, the petitioner must submit evidence that he "has sustained national or international acclaim and that his achievements have been recognized in the field of expertise," 8 C.F.R. § 204.5(h)(3).

18. The petitioner may do that in one of two ways. They may either submit documentation of a one-time achievement (that is, a major, internationally recognized award) or satisfy at least three of the following criteria:

> (i) Documentation of the alien's receipt of lesser nationally or internationally recognized prizes or awards for excellence in the field of endeavor;
>
> (ii) Documentation of the alien's membership in associations in the field for which classification is sought, which require outstanding achievements of their members, as judged by recognized national or international experts in their disciplines or fields;
>
> (iii) Published material about the alien in professional or major trade publications or other major media, relating to the alien's work in the field for which classification is sought. Such evidence shall include the title, date, and author of the material, and any necessary translation;
>
> (iv) Evidence of the alien's participation, either individually or on a panel, as a judge of the work of others in the same or an allied field of specialization for which classification is sought;

> (v) Evidence of the alien's original scientific, scholarly, artistic, athletic, or business-related contributions of major significance in the field;
>
> (vi) Evidence of the alien's authorship of scholarly articles in the field, in professional or major trade publications or other major media;
>
> (vii) Evidence of the display of the alien's work in the field at artistic exhibitions or showcases;
>
> (viii) Evidence that the alien has performed in a leading or critical role for organizations or establishments that have a distinguished reputation;
>
> (ix) Evidence that the alien has commanded a high salary or other significantly high remuneration for services, in relation to others in the field; or
>
> (x) Evidence of commercial successes in the performing arts, as shown by box office receipts or record, cassette, compact disk, or video sales.

8 C.F.R. § 204.5(h)(3)(i)-(x).

19. For nearly two decades following promulgation of the governing regulation at 8 C.F.R. § 204.5(h), the agency adjudicated EB-1 extraordinary ability petitions under a single-step framework, meaning that if a petitioner satisfied at least three of the ten enumerated evidentiary criteria (or submitted comparable evidence), the agency would evaluate eligibility within the structure set forth in the regulation itself. That regulation was duly promulgated through notice-and-comment rulemaking pursuant to the APA, 5 U.S.C. § 553, and it contains no reference to any second, free-standing "final merits determination" layered atop the enumerated criteria.

20. In 1995, when the agency considered modifying the adjudicative structure of 8 C.F.R. § 204.5, it initiated a Notice of Proposed Rulemaking (RIN 1115-AD55) and classified the proposal as a substantive rule, thereby acknowledging that such a structural change required compliance with APA rulemaking procedures. However, that rulemaking was never completed and no final rule was issued. As a result, no amendment to § 204.5(h) was codified.

21. Following the Ninth Circuit's decision in *Kazarian v. USCIS*, 596 F.3d 1115, 1121 (9th Cir. 2010), the agency began to apply a two-step analysis of the petitioner's documentation by first determining whether the petitioner provides evidence of a one-time achievement or documents falling within at least three of the ten regulatory criteria. If the petitioner provides evidence satisfying at least three criteria, USCIS proceeds to evaluate the totality of the evidence to make a final merits determination concerning the petitioner's qualifications and accomplishments, as outlined in Volume 6, Part F, Chapter 2 of the USCIS Policy Manual. At this second stage of review, the Policy Manual instructs that the evidence must establish sustained national or international acclaim and demonstrate that the petitioner belongs to a small percentage of individuals who have risen to the very top of their field of endeavor, as required for classification as an individual of extraordinary ability. *See* 8 U.S.C. § 1153(b)(1)(A)(i); 8 C.F.R. § 204.5(h)(2).

22. The "two-part adjudicative approach," was adopted in 2010 through a policy memorandum. The memorandum was not subjected to meaningful notice-and-comment procedures under 5 U.S.C. § 553; it was not codified in the Code of Federal

Regulations, nor did it amend the text of 8 C.F.R. § 204.5(h). Instead, the agency relied on its general statutory authority under 8 U.S.C. § 1103(a) regarding the Secretary of Homeland Security's authority and cited *Kazarian* as justification. In doing so, it effectively transformed a judicial description of adjudicative reasoning into a binding nationwide adjudicatory framework, without completing the rulemaking process the agency itself had previously recognized as necessary.

23. In 2025, USCIS adopted a contradictory interpretation of the statutory "extraordinary ability" standard to find it can be satisfied based on nothing more than a one-time payment of $1 million.

24. USCIS's new interpretation was precipitated by President Trump's September 19, 2025 Executive Order titled "The Gold Card." 90 Fed. Reg. 46031 (the "EO"). In the EO, the President "announce[d] the Gold Card, a Visa Program overseen by the Secretary of Commerce that will facilitate the entry of aliens who have demonstrated their ability and desire to advance the interests of the United States by voluntarily providing a significant financial gift to the Nation." EO § 1.

25. The EO directs the Secretaries of the Departments of Commerce, State, and Homeland Security to establish a Gold Card program authorizing a noncitizen who makes an unrestricted "gift" to the Commerce Department pursuant to 15 U.S.C. § 1522 to "establish eligibility for an immigrant visa using an expedited process." EO § 2.

26. The Department of Homeland Security, through USCIS, implemented the EO by adopting a review process that treats the $1 million gift as sufficient to

establish EB-1A eligibility. *See* Exhibit B, USCIS Gold Card Officer Training Materials. USCIS officers do not subject Gold Card applicants to a commensurate final merits determination. *Id.* at 27. They do not require Gold Card applicants to show that they have a "career of acclaimed work," that they enjoy sustained national or international acclaim, or that they "have separated [themselves] from almost all others as having risen to the very top of [the] field of endeavor," as USCIS required of Mr. Nanda. Compare *Id.* at 27 *with* Exhibit A at 8–11.

## FACTUAL ALLEGATIONS

27. Mr. Nanda is an internationally recognized professional with exceptional expertise in technology investments and corporate development.

28. On April 16, 2025, Mr. Nanda filed, through counsel, a Form I-140 petition for classification as a foreign national of extraordinary ability based on his experience and achievements in the field of technology investments and corporate development. He submitted evidence supporting seven regulatory criteria: membership, published material about him, judging, original contributions of major significance, authorship, leading or critical role, and high remuneration.

29. On May 5, 2025, USCIS issued a Request for Evidence ("RFE"). USCIS found that Mr. Nanda satisfied the judging criterion and requested additional evidence concerning the other six criteria claimed in the petition.

30. Petitioner provided a timely response. On July 18, 2025, USCIS denied the petition. In the denial USCIS found that Mr. Nanda also satisfied the judging, membership, published-material, and authorship criteria, bringing the total to four satisfied criteria—more than the three required to proceed beyond the threshold

evidentiary showing. USCIS nevertheless denied the petition at final merits, concluding that Mr. Nanda had not demonstrated sustained national or international acclaim or that he had risen to the very top of the field.

31. The submitted evidence demonstrates that Mr. Nanda is an alien of extraordinary ability in the field of technology investments and corporate development. Through the extensive documentation, Mr. Nanda established his sustained international reputation and significant contributions to this critical field. His extraordinary achievements and expertise position him at the very top of his field, meeting the high standards required for EB-1A classification.

32. USCIS denied the petition at the final-merits stage in a decision containing factual and legal errors.

33. USCIS did not identify an independent deficiency in Mr. Nanda's intent to continue work in his area of extraordinary ability or in the requirement that his entry prospectively benefit the United States; the denial rested on USCIS's extraordinary-ability and final-merits analysis.

**A. Mr. Nanda's Field: Technology Investments and Corporate Development**

34. Mr. Nanda holds a Bachelor of Engineering in Computer Science degree from Nanyang Technological University and a Master of Business Administration (M.B.A.) degree from Harvard Business School.

35. Mr. Nanda works in the field of technology investments and corporate development. That field concerns the evaluation, financing, acquisition, strategic positioning, and growth of technology businesses, including software and other

innovation-driven enterprises. It requires professionals to assess companies not only as operating businesses, but also as strategic assets whose products, capabilities, market positions, and long-term commercial prospects can affect broader competitive and investment outcomes. The field therefore sits at the intersection of technology, finance, strategy, and capital allocation.

36. The field is economically and practically important because technology companies occupy a central role in the modern United States economy. Software and related technology businesses drive productivity, enterprise operations, digital transformation, and innovation across industries. Investment and corporate-development decision-making in this space affects which companies receive capital, which technologies are scaled, which products are integrated into larger business platforms, and how firms compete in domestic and global markets. As a result, work in technology investments and corporate development directly influences commercial growth and the development of strategically significant enterprises.

37. The field also requires specialized expertise. Technology companies often cannot be evaluated through ordinary financial metrics alone. Meaningful analysis requires an understanding of product architecture, software business models, recurring-revenue dynamics, market adoption, competitive differentiation, scalability, operational execution, and the commercial implications of emerging technologies. It also requires the ability to synthesize technical, financial, and strategic information in order to assess value, risk, and long-term business potential.

38. Because of those demands, technology investments and corporate development constitute a difficult and highly specialized field. Professionals operating at a high level in this area must integrate quantitative analysis, financial modeling, market knowledge, and informed judgment regarding technology trends, industry structure, and transaction strategy. They must evaluate not only present performance, but also whether a company's technology, management, and strategic position justify investment, acquisition, or expansion decisions. That work requires independent judgment in circumstances where the relevant information is complex, fast-changing, and commercially consequential.

39. Mr. Nanda's work falls within that specialized field. As reflected in the administrative record, his background spans software engineering, corporate strategy and development, and technology investing. The record further reflects that Mr. Nanda served in Corporate Strategy and Development at Microsoft, later worked as a Technology Investment Professional at Partners Group, and subsequently served in senior management in a corporate-development capacity at Advantive and Revalize. That combination of experience reflects the kind of judgment required to assess companies, products, and growth opportunities in technology investments and corporate development.

40. The field is strategically important to the United States because it informs capital allocation and strategic decision-making in industries tied to innovation, digital infrastructure, software adoption, and business competitiveness. The United States has a strong interest in the efficient financing, growth, and

strategic development of technology enterprises, particularly where those enterprises contribute to productivity, market innovation, and the country's broader economic strength. Specialized work in technology investments and corporate development advances those interests by helping market participants and operating companies assess opportunities, deploy capital, and make strategic decisions in a sector of substantial national importance.

41. The field is also significant because relatively few professionals possess the technical training, financial sophistication, and strategic experience necessary to perform this work at a high level. As reflected in the administrative record, Mr. Nanda's education in computer science and business, together with his experience at recognized organizations including Microsoft, Partners Group, Revalize, and Advantive, placed him in a position to assess technology businesses from technical, strategic, and investment perspectives. His work therefore arose in a field that is specialized, economically consequential, and important to the United States.

**B. Membership in an Association Requiring Outstanding Achievement**

42. Mr. Nanda was admitted in 2024 as a member of the Forbes Finance Council, an association in his field that was presented in the administrative record as requiring a selective admission process tied to professional accomplishment. As reflected in the record, Mr. Nanda supplemented the initial filing through the RFE response with a letter from Forbes Finance Council and the organization's Membership Terms of Service to document both the existence of his membership and the standards governing admission. The record thus included documentary evidence

identifying the specific association, confirming Mr. Nanda's membership, and describing the criteria by which applicants are evaluated for acceptance into that body.

43. The submitted evidence established that this membership satisfies the plain language of the criterion because it concerns membership in an association in the field for which classification is sought and because the association's admission process, as documented in the RFE materials, is based on demonstrated professional achievement rather than mere payment of dues or open enrollment. The Forbes Finance Council is not presented in the record as a general public subscription or automatic membership organization. Rather, the submitted membership letter and governing membership materials were offered to show that admission is selective and contingent on a candidate's established professional standing and accomplishments in the relevant field.

44. The evidence also showed that the association's membership standards are tied to outstanding achievement. As reflected in the materials submitted with the RFE response, the membership framework evaluates applicants based on indicators of high professional distinction, including significant experience, leadership, recognized expertise, and meaningful contributions in the relevant discipline. Those are the kinds of achievement-based requirements contemplated by the regulation, which asks whether the association requires outstanding achievements of its members. The evidence therefore did not merely show that Mr. Nanda joined a

professional group, but that he was admitted to a membership body whose standards are based on elevated professional accomplishment.

45. The record further showed that these achievement-based admissions are assessed by recognized national or international experts. The Forbes Finance Council letter explained that applicants must first meet threshold requirements for senior-level leadership and company size, after which a professional selection committee evaluates their qualifications, including publications, speaking engagements, and other contributions demonstrating knowledge and expertise. The letter further stated that only about 10 to 11 percent of applicants are accepted and that membership decisions are made by recognized national or international experts in finance. That evidence directly addressed the regulatory requirement that outstanding achievements be judged by recognized national or international experts in the discipline or field.

46. Mr. Nanda's membership also related directly to the field for which classification was sought. As set forth in the petition and RFE response, Mr. Nanda's field is technology investments and corporate development, a field where finance, strategy, and the evaluation of innovation-driven enterprises intersect. The Forbes Finance Council membership evidence was submitted as proof of Mr. Nanda's recognition within that professional domain, and thus as evidence of membership in an association connected to the field of endeavor identified in the petition.

47. In short, the evidence submitted with the petition and especially with the RFE response established more than mere affiliation. It showed membership in

a selective professional association, documented by organization-issued materials, and tied to standards of accomplishment, expertise, and professional distinction in Mr. Nanda's field. That evidence directly addressed the regulation's requirement that the association require outstanding achievements of its members, as judged by recognized national or international experts.

48. USCIS determined that Mr. Nanda satisfied this criterion.

**C. Published Material about Mr. Nanda in Major Media**

49. In support of the criterion for published material about Mr. Nanda in professional or major trade publications or other major media, he submitted multiple articles published in recognized media outlets discussing him and his varied work in technology investments and corporate development. As reflected in the record, those materials included, among others, the article *Manufacturing's Software Revolution: Key Trends and Insights from an Industry Expert and Investor*, published on NYTech (syndicated through Benzinga) on or about November 17, 2024; *The AI Advantage in Private Equity & M&A: Faster Deals, Smarter Investments, and More Profitable Outcomes*, published through MSN; and *The Road to Autonomy: A Tech Strategist and Investor's View on the State of Self-Driving Cars*, published by TechBullion on or about December 17, 2024. The submitted materials were plainly about Mr. Nanda, because they identified him by name, centered on his professional background and expertise, and discussed his views on technology, private equity, and mergers and acquisitions for the benefit of the broader finance and technology communities. The record further reflected that Mr. Nanda supplemented the articles themselves with

outlet-specific media information and analytics concerning Benzinga, MSN, DNAIndia, and TechBullion in order to document the stature, visibility, and reach of the media in which the published material appeared.

50. Further establishing his recognition in the field, the submitted articles expressly identified Mr. Nanda in elevated professional terms tied to his expertise in the field. The NYTech/Benzinga article described him as "M&A lead at global manufacturing software platform Revalize and former technology investor at Partners Group" and presented the article itself as "Key Trends and Insights from an Industry Expert and Investor." The MSN article described him as "a seasoned M&A, private equity, and strategy professional". And the TechBullion article likewise explicitly identified Mr. Nanda as "a tech strategist and investor with deep expertise in connected and autonomous vehicle systems." These descriptions are significant because they show that independent publications were not merely mentioning Mr. Nanda in passing but were presenting him to readers as an expert source whose professional track record and insight warranted focused coverage.

51. These publications directly quote Mr. Nanda and discuss his specific contributions to advancing technology investments and corporate development, demonstrating his recognition as a leading authority in the field. In the Benzinga article, Mr. Nanda is quoted at length regarding the role of software in manufacturing, the importance of supply-chain digitization, the rise of environment, health, and safety software including his leadership in Partners Group's investment in VelocityEHS, and the use of AI to improve US manufacturing competitiveness. In

the MSN feature, Mr. Nanda is quoted explaining how AI improves deal sourcing, due diligence, and portfolio management in private equity and M&A, including statements that AI "helps percolate relevant information to the top much more quickly" and helps investors "catch red flags early," thereby sharpening diligence and investment decision-making. In the TechBullion article, Mr. Nanda is recognized for his work on Microsoft's Connected Vehicle Platform and quoted on the current state of self-driving technology, levels of vehicle autonomy, and investment opportunities in the broader connected and autonomous vehicle ecosystem.

52. USCIS determined that Mr. Nanda satisfied this criterion.

**D. Participation as a Judge of the Work of Others**

53. Mr. Nanda has also been invited to serve as a judge of the work of others in his field through multiple review and editorial roles documented in the record. The evidence submitted included a November 12, 2024 confirmation letter from the President of the Globee® Awards stating that Mr. Nanda "participated as an industry expert member of the valued jury" to review nominees for the 12th Annual 2024 Globee® Awards for Leadership, the 14th Annual Globee® Awards for Business, and the 17th Annual 2024 Globee® Awards for Women in Business. The same submission also included certificates recognizing Mr. Nanda's contribution and dedication as an industry judge for those 2024 Globee® Awards programs. In addition, Mr. Nanda submitted evidence of his appointment as Associate Editor for the Sarcouncil Journal of Economics and Business Management and the Sarcouncil Journal of Entrepreneurship and Business Management, as well as his election as an Editorial

Member of the International Research Journal of Economics and Management Studies (IRJEMS) in 2025. The record further included certificates documenting his actual peer review of multiple manuscripts.

54. The Globee® Awards letter expressly confirms that Mr. Nanda served as a jury member reviewing and scoring nominees for business and leadership awards. The letter further explains that Globee® judges are chosen based on "industry expertise, leadership skills, and ability to evaluate the quality of the nominated entries." It specifically states that Mr. Nanda was selected in recognition of his expertise in private equity investments, M&A, and technology, as demonstrated through his work at Revalize, Partners Group, and Microsoft.

55. The documentary evidence also showed that Mr. Nanda was selected to evaluate scholarly and professional work for journals and publication-related bodies. His appointment as Associate Editor for the Sarcouncil Journal of Economics and Business Management and the Sarcouncil Journal of Entrepreneurship and Business Management, and as an Editorial Member of IRJEMS, was reinforced by specific peer-review certificates identifying manuscripts Mr. Nanda reviewed, including "Impact of Private Equity on Corporate Finance and Growth" for IRJEMS and several SARC manuscripts addressing subjects including cloud computing, artificial intelligence, and organizational performance. The IRJEMS materials further documented an editorial appointment in March 2025 and peer-review activity in April 2025.

56. Mr. Nanda's judging and peer-review work was also tied to the field identified in the petition. The Globee® Awards evidence states that he was selected because of his expertise in private equity investments, M&A, and technology. His journal review assignments likewise concerned finance, management, business, and technology subjects within or allied to his field of endeavor.

57. The evidence further demonstrated that Mr. Nanda's review responsibilities required substantive expert judgment rather than ministerial participation. His SARC and IRJEMS peer-review assignments likewise required him to assess the quality and suitability of manuscripts submitted by others. These were substantive evaluative functions, not passive affiliations.

58. The record therefore matched the regulatory language directly. Mr. Nanda submitted evidence showing that he served as a jury member reviewing award nominees, held editorial appointments with business and economics journals, and performed peer review of specific manuscripts authored by others. The evidence thus satisfied the criterion's requirement of participation as a judge of the work of others in the same or an allied field of specialization.

59. USCIS determined that Mr. Nanda satisfied this criterion.

**E. Mr. Nanda's Original Contributions of Major Significance**

60. Mr. Nanda submitted evidence that he made original contributions of major significance in technology investments and corporate development, particularly in private equity software investing, strategic transaction execution, competitive technology strategy, and acquisition strategy. The record described his

work at Microsoft, Partners Group, Revalize, and Advantive, where his contributions influenced corporate strategy, investment decision-making, product direction, and acquisition activity.

61. The record described Mr. Nanda's original contributions at Microsoft to competitive strategy and technology partnership development. Jordan Usdan, a Senior Director in Microsoft's Office of the CTO and former Senior Director of Corporate Strategy and Development, stated that Mr. Nanda's work laid the groundwork for the Microsoft Connected Vehicle Platform (MCVP), a novel initiative announced in 2017 that empowered global automakers such as Renault-Nissan to create custom connected driving experiences, marking Microsoft's entry into connected car ecosystem. In 2017, MCVP represented a first in the industry, as the first unified, cloud-based connected vehicle system for automakers to fundamentally improve safety, efficiency, and navigation, which positioned Microsoft as a partner rather than a competitor in the automotive landscape.

62. Mr. Nanda also submitted evidence concerning his role in Partners Group's $900 million-plus investment in IDERA, which valued the company at more than $3 billion and was described as Partners Group's largest software investment to date. In a detailed letter, Chris Russell, former Managing Director at Partners Group who managed the IDERA investment, stated that Mr. Nanda's leadership, from commercial due diligence to post-acquisition integration and continuous value enhancement, underscores his exceptional contributions to Partners Group and the broader private equity industry. Terry Angelos, co-founder and former CEO of

TrialPay, further explained that Mr. Nanda created a proprietary process for IDERA that helped Partners Group move ahead of competing global investment funds. He also created a post-acquisition tracking system to monitor major products and guide the allocation of investment resources, setting the stage for IDERA's continued organic and inorganic growth. The letter did more than praise Mr. Nanda's abilities; it identified the processes he developed, how they were used, and their importance to a major commercial investment.

63. The record likewise described Mr. Nanda's contributions to Partners Group's $330 million investment in VelocityEHS with unique due diligence methodology and deal. The submitted evidence supports that investment was pivotal not only for Partners Group but also for the employee health & safety software industry, as VelocityEHS holds a dominant position in delivering advanced regulatory compliance, risk reduction, and operational efficiency software solutions to over 18,000 customers worldwide across critical sectors such as manufacturing, food and beverage, pharmaceuticals, and chemicals.

64. Mr. Nanda's evidence also showed the scale of these contributions. His work included the $900 million-plus IDERA investment and the approximately $330 million VelocityEHS investment. The record further states that the IDERA investment was expected to generate an equity return of more than $2 billion at exit. Those figures provided objective evidence that Mr. Nanda's work was used in investment decisions involving hundreds of millions of dollars and multibillion-dollar valuations and expected returns.

65. The documentary record included testimony from experienced industry leaders describing the importance of Mr. Nanda's contributions. Christopher J. Russell, a former Managing Director at Partners Group stated that Mr. Nanda's work with IDERA was transformative and set new standards in private equity software acquisitions. Oliver Staehelin, Chief Corporate Development Officer of Advantive, likewise described Mr. Nanda's work as extending beyond the company itself to the broader sectors. Iqram Magdon-Ismail, co-founder of Venmo and Jelly, described Mr. Nanda's work as pioneering and stated that his contributions had advanced industry standards and influenced corporate strategy. These were not generalized character references, but testimony identifying Mr. Nanda's contributions and explaining their significance in the field.

66. Mr. Magdon's letter also did not speak in abstractions. Rather, it identified a specific transaction and described the concrete contributions that made Mr. Nanda's work significant. Mr. Magdon wrote that one of Mr. Nanda's "most notable achievements at Partners Group" was his leadership of the "$330 million investment in VelocityEHS," which he described as a leading SaaS platform providing environment, health, and safety solutions to more than 20,000 clients worldwide. According to Mr. Magdon, Mr. Nanda's "groundbreaking approach to due diligence"—combining external expert input with proprietary intelligence from Partners Group portfolio companies, as well as information gathered through direct outreach to competitors and former employees—was pivotal to securing the investment. Mr. Magdon further explained that this methodology "set new standards at Partners

Group and across the private equity industry," helped the firm secure a competitive position against other private-equity bidders, and supported Partners Group's entry into the Governance, Risk, and Compliance software market. These are specific descriptions of identifiable work, tied to a major transaction and to concrete business consequences, and thus provide more than generalized testimonial praise.

67. Viewed as a whole, the record therefore contained identifiable original contributions by Mr. Nanda, including the first-of-its-kind monthly competitive report at Microsoft, strategic work contributing to the TomTom partnership, a proprietary diligence process and post-acquisition tracking system for the IDERA transaction, and strategic and deal-structuring work on the VelocityEHS investment.

68. The record further showed their significance through their use by senior decision-makers, their application in transactions involving hundreds of millions of dollars and multibillion-dollar valuations, and recognition from industry leaders. The evidence thus showed more than competent participation in important projects: it attributed to Mr. Nanda original work implemented in consequential corporate and investment settings and recognized as having substantial importance in his field.

**F. Authorship of Scholarly Articles in Major Media**

69. Mr. Nanda has authored multiple articles in recognized professional and major-media publications addressing subjects at the core of his field, including technology investments, mergers and acquisitions, and operational value creation. The record reflects articles published in Forbes and HackerNoon under Mr. Nanda's name and professional biography.

70. Specifically, the record shows that Mr. Nanda authored, among other works, "Startup Acquisitions: How to Navigate an Acquisition Process as a Seller"; "Startup Acquisitions: How to Navigate an Acquisition Process as a Seller (Part 2 of 2)"; "Generating Value In Tech M&A And Private Equity: What's Old Is New Again"; and "5 Key Metrics Investors & Acquirers Value Most In Enterprise Software". The first two appeared in HackerNoon and the latter two in Forbes. The evidence thus consists of articles written by Mr. Nanda himself and published in recognized outlets.

71. The subject matter of these works further demonstrates their direct relevance to Mr. Nanda's field. In the two HackerNoon articles, he explained the acquisition process from the seller's perspective, including buyer motivations, letters of intent, due diligence, valuation and acquisition terms, and post-transaction considerations. Those subjects concern precisely how technology companies are evaluated, negotiated, and sold.

72. Mr. Nanda's Forbes authorship is similarly tied to technology investing and corporate development. In "Generating Value In Tech M&A And Private Equity: What's Old Is New Again," he discusses strategic realignment, cloud-subscription transition, operational efficiency, KPI-driven oversight, leadership assessment, incentive alignment, and accretive follow-on acquisitions in fragmented technology sectors. In "5 Key Metrics Investors & Acquirers Value Most In Enterprise Software," he identifies and explains annual recurring revenue growth, net dollar retention, the Rule of 40, and customer-acquisition-cost payback period, as well as how those metrics bear on growth, profitability, scalability, and valuation.

73. The evidence also shows that Mr. Nanda's authorship was not generic business commentary, but specialized writing grounded in professional expertise. The HackerNoon articles introduce him as someone who has worked for more than seven years in technology private equity, M&A, and corporate strategy roles after beginning as a software engineer. The Forbes materials identify him as a technology M&A, PE, and strategy professional and, in one article, note his experience investing more than $1.5 billion in cumulative investment.

74. The publication venues themselves also supported the criterion. HackerNoon is a technology-focused publication covering startups, software, investing, and technology with monthly readership exceeding 4 million, while Forbes is a major business and financial publication read by millions of global readers.

75. On the face of the record, this evidence satisfies the plain language of the authorship criterion. Mr. Nanda submitted proof that he authored articles in the field of technology investments, M&A, and corporate development that were published in recognized professional publications or major media, including HackerNoon and Forbes. The record showed Mr. Nanda's articles published on both platforms under his byline and professional profile.

76. USCIS determined that Mr. Nanda satisfied this criterion.

### G. Mr. Nanda's Leading and Critical Roles in the Field of Technology Investments and Corporate Development

77. Mr. Nanda performed in leading and critical roles for organizations with distinguished reputations in the technology and investment sectors, including Microsoft, Partners Group, Revalize, and Advantive. Over more than a decade, he

progressed from software engineering to corporate strategy and development, private-equity technology investing, to senior corporate-development leadership. The record reflects that these organizations repeatedly entrusted him with responsibilities tied to investment, acquisitions, and strategy.

78. Mr. Nanda served in a leading and critical role at Microsoft from approximately 2013 to 2017, first as a Software Development Engineer (2013-2014) and then as a Corporate Strategy and Development Manager (2014-2017). The petition materials show how Mr. Nanda played a pivotal role in developing the Microsoft Connected Vehicle Platform (MCVP), a first-of-its-kind platform for global auto manufacturers such as Renault-Nissan to create custom connected driving experience, marking Microsoft's entry into the burgeoning connected car ecosystem. The evidence also described his development of a monthly competitive report for Microsoft's CEO and Executive Leadership Team as the first report of its kind within the company, providing actionable intelligence concerning major competitors and evolving technology-market conditions. These responsibilities placed Mr. Nanda's work directly within strategic initiatives considered by Microsoft's senior leadership.

79. Microsoft's distinguished reputation is well established in the record. The materials identify Microsoft as one of the most prominent technology companies in the world, and the supporting exhibit concerning the Microsoft Connected Vehicle Platform (MCVP) describes the company's role in bringing cloud, artificial intelligence, mapping, productivity, and data capabilities into the automotive sector. That exhibit explains that Microsoft's cloud would ingest and analyze enormous

volumes of connected-vehicle data and help automakers address predictive maintenance, advanced navigation, productivity, customer insights, and autonomous-driving capabilities. In that context, Mr. Nanda's strategy and development work was critical because it contributed to the company's response to rapidly shifting competitive conditions and to strategic initiatives in high-value growth markets. When a company of Microsoft's scale entrusts an employee with work product designed for its top leadership and tied to major industry-facing offerings, that is strong evidence of a leading or critical role for an organization with a distinguished reputation.

80. Mr. Nanda also served in a leading and critical role at Partners Group from approximately 2019 to 2023 as a Technology Investment Professional. The record attributes to him substantial responsibility in evaluating, executing, and advancing major software investments. In particular, the evidence described Mr. Nanda's central role in the firm's $900 million-plus investment in Idera, a leading global provider of DevOps and database software solutions, which employs 570 employees and serves 50,000 customers worldwide. Mr. Nanda also played a central role in Partners Group's $330 million investment in VelocityEHS, a leading employee health and safety software platform which serves 18,000 customers worldwide across critical sectors such as manufacturing, food and beverage, pharmaceuticals, and chemicals. The petition materials explained that he led or materially contributed to business and market diligence, competitive analysis, product and technology assessment, deal execution, and post-acquisition growth initiatives. Those are not

managerial tasks. These functions are central to how a private-equity technology investor allocates capital, prices risk, and drives value creation in portfolio companies. The record therefore shows that Mr. Nanda's role at Partners Group was critical to major investment decisions affecting large technology enterprises and significant deployed capital.

81. The documentary evidence strongly supports Partners Group's distinguished reputation. The record described the firm as a leading global private markets investment manager that had over $150 billion of assets under management (AUM) across private equity, real estate, debt, and infrastructure; employed more than 1,500 professionals, including more than 300 in the U.S.; and operated across 20 offices worldwide. Against that backdrop, Mr. Nanda's diligence and transaction work on major software investments was central to Partners Group's core business of evaluating and deploying capital in companies, real estate, and infrastructure.

82. Mr. Nanda next performed in a leading and critical role at Revalize from approximately 2024 to 2025, where the record reflects that he served in a senior management and corporate-development capacity. The record shows that Revalize is a major software platform focused on manufacturers of complex products that provides cloud-based idea-to-cash solutions across the manufacturing value chain. Revalize serves 15,000+ customers globally, operates through 19 brands, and helps customers design, customize, quote, and sell more than $8 billion in products every month. Mr. Nanda's role was critical because it was tied to acquisition strategy,

growth planning, and the evaluation of software businesses, functions directly affecting the company's strategic direction and expansion.

83. The record also reflects that Mr. Nanda served in a critical corporate-development role at Advantive, another distinguished mission-critical software company. The record describes Advantive as a leading provider of mission-critical software for specialty manufacturing and distribution businesses, serving over 6,500 customers in 88 countries. Mr. Nanda's role in sourcing, evaluating, and advancing transactions was critical because those activities directly affected Advantive's product offerings, geographic expansion, and growth strategy.

84. The record as a whole therefore satisfies the plain language of the leading or critical role criterion. It shows that Mr. Nanda performed roles tied to essential strategic and commercial functions for organizations with distinguished reputations. At Microsoft, his work informed senior leadership and high-priority strategic initiatives. At Partners Group, he contributed directly to large-scale technology investment and acquisition decisions for a premier global private-markets firm. At Revalize and Advantive, he served in senior corporate-development roles within major software platforms pursuing growth and acquisition strategies across global markets.

85. At bottom, the record shows more than employment by influential companies. It ties Mr. Nanda personally to responsibilities central to competitive strategy, investment underwriting, acquisition execution, and growth at organizations whose distinguished reputations are independently documented.

**H. Mr. Nanda's High Remuneration for Services in Technology Investments and Corporate Development.**

86. Mr. Nanda has commanded exceptionally high remuneration for his services in technology investments and corporate development. His 2023 Form W-2 from Partners Group reports $389,355.22 in wages, tips, and other compensation. Mr. Nanda submitted that W-2 and related compensation documentation as objective evidence of what he actually earned.

87. The evidence further showed that Mr. Nanda's compensation substantially exceeded compensation levels earned by other professionals in comparable roles. According to the U.S. Bureau of Labor Statistics Occupational Employment Statistics, the nationwide 90th percentile wage for Financial Managers (SOC Code 11-3031) is $208,000.00.

88. Regional wage data submitted with the petition reinforced the same conclusion. The OFLC prevailing wage database showed that the Level 4 wage for Financial Managers in the Denver-Aurora-Lakewood Metropolitan Statistical Area was $229,216.00, and CareerOneStop listed the 90th percentile wage for Financial Managers in Arvada, Colorado at $239,200.00. Mr. Nanda's salary exceeded the OFLC Level 4 figure by approximately 69.8% and exceeded the CareerOneStop 90th percentile benchmark by more than 62%. These comparisons demonstrated that his compensation was not only high in absolute terms, but also materially above top-tier compensation levels in his local and regional labor market.

89. The petition also included corroborating compensation data from PayScale, which further confirmed the exceptional level of Mr. Nanda's

remuneration. That evidence showed that the 90th percentile total compensation for Senior Financial Managers nationwide was $177,000.00, while the 90th percentile total compensation for Senior Financial Managers in Denver, Colorado,[2] was $155,000.00. Mr. Nanda's compensation exceeded the national PayScale benchmark by approximately 120% and the Denver benchmark by more than 151%. These figures provided additional objective support that his earnings placed him far above the upper end of compensation ordinarily earned by similarly situated professionals.

90. Mr. Nanda's comparisons were also conservative. Rather than relying on average or median wages, the petition compared his compensation against 90th-percentile wage levels and a Level 4 prevailing wage. His compensation still substantially exceeded those upper-end benchmarks.

91. In sum, the record established through W-2 documentation that Mr. Nanda received $389,355.22 in wages, tips, and other compensation from Partners Group in 2023 and that this amount substantially exceeded national, regional, and local benchmark compensation for similarly situated professionals. The evidence therefore demonstrated that Mr. Nanda commanded a high salary or other significantly high remuneration for services in relation to others in the field.

## CAUSES OF ACTION

### COUNT I: Denial of "Leading or Critical Role" Criterion

### Agency Action Taken in Violation of 5 U.S.C. § 706(2)(A), (C) Relating to the Criterion Under 8 C.F.R. § 204.5(h)(3)(viii)

[2] Partners Group's U.S. headquarters is in Broomfield, Colorado.

92. Plaintiff incorporates the allegations in Paragraphs 1 through 91 of this Complaint as if fully restated here.

93. USCIS's decision denying Mr. Nanda's immigrant visa petition constitutes a final agency action and is reviewable under the APA. See 5 U.S.C. §§ 704, 706(2).

94. USCIS's decision denying Mr. Nanda's petition is inconsistent with the APA. Specifically, USCIS's determination that Mr. Nanda did not satisfy the leading-or-critical-role criterion under 8 C.F.R. § 204.5(h)(3)(viii) is arbitrary and capricious, contrary to law, and unsupported by a reasoned evaluation of the administrative record. *See* 5 U.S.C. § 706(2).

95. Under 8 C.F.R. § 204.5(h)(3)(viii), the criterion is met where the petitioner demonstrates that he "performed in a leading or critical role for organizations or establishments that have a distinguished reputation." The regulation does not require a petitioner to prove that he was singularly indispensable to the entire enterprise, "critical to operational viability," or positioned on a formal organizational chart in a particular way. Rather, the inquiry is whether the petitioner performed in a leading role or a critical role of significant importance to the outcome of the activities of the organization or a division or department within an organization of distinguished reputation.

96. USCIS's Policy Manual states that this is "one criterion where letters from persons with personal knowledge of the significance of the person's leading or critical role can be particularly helpful to officers in making this determination, so

long as the letters contain detailed and probative information that specifically addresses how the person's role for the organization, establishment, division, or department was leading or critical." USCIS Policy Manual, Vol. 6, Pt. F, Ch. 2. The Policy Manual further instructs officers to evaluate such evidence for relevance, probative value, and credibility in light of the totality of the record.

97. Mr. Nanda submitted substantial evidence showing that he performed in leading or critical roles for multiple organizations of distinguished reputation, including Partners Group, Microsoft, Revalize, and Advantive. The record included detailed letters from Mr. Christopher Russell regarding Partners Group, Mr. Jordan Usdan regarding Microsoft, and Mr. Oliver Staehelin regarding Advantive and Revalize. Those letters described Mr. Nanda's responsibilities and their importance to strategic, transactional, and commercial outcomes, while documentary evidence established the organizations' scale and reputation.

98. With respect to Microsoft, the record established both the company's distinguished reputation and the critical nature of Mr. Nanda's role. The filing explained that Microsoft, founded in 1975, is among the most prominent technology companies in the world, transformed personal and business computing through products such as Windows and Office, leads in cloud computing through Microsoft Azure, invests heavily in AI, cybersecurity, and data analytics, and often maintains a market capitalization exceeding $2 trillion. Mr. Nanda then submitted a detailed letter from Mr. Jordan Usdan, Senior Director, Strategy & Innovation, Office of the CTO at Microsoft, explaining that Mr. Nanda "served as a Corporate Strategy and

Development Manager, advising on growth strategy and emerging opportunities, particularly in cloud-based services." Mr. Usdan further stated that Mr. Nanda's expertise in identifying market opportunities and translating strategic insights into tangible business outcomes was crucial to facilitating Microsoft's entry into the burgeoning connected vehicle market through the Microsoft Connected Vehicle Platform. Mr. Usdan further added that a competitive report "provided senior Microsoft leadership with essential, data-driven insights into the competitive landscape, directly informing strategic decisions at the highest levels of the company," and that Mr. Nanda's work "set a new standard for Microsoft's approach to competitive intelligence."

99. That evidence squarely demonstrated a leading and critical role. USCIS's own discussion of Mr. Nanda's OCMS evidence quoted Mr. Usdan's view that Mr. Nanda's Microsoft contributions were "nothing short of extraordinary" and had "left a lasting impact on Microsoft's approach to competitive strategy and Microsoft's cloud offering, including its connected vehicle platform." Yet USCIS did not meaningfully explain why work described in those terms failed to demonstrate a role of significant importance under § 204.5(h)(3)(viii).

100. With respect to Partners Group, the record established the firm's distinguished reputation and tied Mr. Nanda's responsibilities directly to major technology investments. Christopher Russell, former Managing Director at Partners Group, explained that Mr. Nanda served as "a Technology Investment Professional for Direct Technology Investments at Partners Group" and was responsible for

deploying more than $1.5 billion in equity capital across investments with a combined enterprise value exceeding $5 billion. Mr. Russell further described Mr. Nanda's work on the $330 million acquisition of VelocityEHS, stating that Mr. Nanda "managed due diligence and investment structuring" for the transaction and "pioneered an innovative approach to due diligence" that "set a new standard for such processes at Partners Group" and positioned the firm favorably against competing private equity bidders.

101. Managing diligence and structuring for a nine-figure investment, through a methodology described as setting a new standard and improving the firm's competitive position, directly addressed whether Mr. Nanda's role was of significant importance to Partners Group's investment activities.

102. With respect to Advantive, Mr. Nanda submitted evidence that the company is an industry-leading mission-critical software provider serving thousands of customers across dozens of countries.

103. Mr. Nanda's role at Advantive was likewise shown to be leading or critical. Mr. Oliver Staehelin, Chief Corporate Development Officer at Advantive, explained that he recruited Mr. Nanda "to help lead Advantive's global corporate development efforts based on his history of success driving M&A activities and deals," that Mr. Nanda reports directly to him, and that Mr. Nanda works closely with Advantive's leadership team "to identify, source, and execute strategic acquisitions for Advantive in the US and globally." Mr. Staehelin further explained that Mr. Nanda manages "the full transaction lifecycle from valuation and due diligence to

structuring and negotiations," including multimillion-dollar acquisitions. Those responsibilities went directly to Advantive's acquisition and expansion strategy and therefore addressed the substance of the leading-or-critical-role inquiry.

104. Mr. Nanda also submitted evidence concerning Revalize, another distinguished software platform. The record showed that it serves more than 15,000 customers globally, encompasses 19 brands, and supports more than $8 billion in products every month. Mr. Staehelin explained that Mr. Nanda previously worked with him at Revalize "to lead strategic acquisitions," tying Mr. Nanda's role directly to the company's acquisition and growth strategy.

105. Despite this record, Defendants concluded that Mr. Nanda failed to show that his roles were leading or critical. The denial instead characterized Mr. Nanda's work as "middle management ensuring that assigned tasks are accomplished correctly and in a timely manner." Exhibit A at 8. That characterization does not meaningfully engage the substance of Mr. Nanda's responsibilities. The Policy Manual asks whether the person's role was leading or of significant importance to the outcome of the organization's activities or those of a division or department. Mr. Nanda submitted evidence that he produced strategic intelligence for Microsoft's senior leadership, managed diligence and investment structuring for major Partners Group transactions, and helped lead acquisition strategy and execution at Advantive and Revalize. USCIS did not explain how those responsibilities amounted merely to routine "middle management."

106. USCIS also failed to meaningfully evaluate the detailed testimonial evidence. The letters from Mr. Usdan, Mr. Russell, and Mr. Staehelin explained why Mr. Nanda's roles mattered, what strategic and transactional responsibilities he held, and how his work affected important outcomes. Yet USCIS did not identify any credibility defect in those letters or explain why their detailed accounts failed to establish a leading or critical role. The conclusory "middle management" characterization did not supply that analysis.

107. The record also shows that USCIS failed to evaluate the evidence in context. In business strategy, private equity, and corporate development, leading or critical roles may be demonstrated through trusted responsibility for high-value transactions, competitive intelligence, investment decisions, and strategic execution. Mr. Nanda's evidence reflected precisely that form of significance. USCIS did not meaningfully address that evidence before reducing Mr. Nanda's work to "middle management."

108. Moreover, USCIS's treatment of this criterion is in tension with its own discussion elsewhere in the denial. In addressing Mr. Nanda's OCMS evidence, USCIS quoted Mr. Usdan's statement that Mr. Nanda's Microsoft contributions were "nothing short of extraordinary," and had left "a lasting impact on Microsoft's approach to competitive strategy and Microsoft's cloud offering." Although the two criteria are distinct, USCIS did not explain why evidence describing Mr. Nanda's Microsoft work as having an extraordinary and lasting strategic impact nevertheless failed to show that his role was of significant importance to Microsoft's activities.

109. By reducing Mr. Nanda's responsibilities to "middle management" without meaningfully addressing the detailed employer letters or corroborating evidence of his strategic and transactional responsibilities, Defendants acted arbitrarily, capriciously, and contrary to law. See 5 U.S.C. § 706(2)(A), (C).

110. Defendants' decision that Mr. Nanda did not establish that he performed in a leading or critical role for organizations with a distinguished reputation under 8 C.F.R. § 204.5(h)(3)(viii) should therefore be set aside as arbitrary and capricious and contrary to law. *See* 5 U.S.C. § 706(2)(A), (C). The record contained detailed testimony and documentary evidence bearing directly on both the importance of Mr. Nanda's roles and the distinguished reputations of the organizations. USCIS did not provide a reasoned explanation for rejecting that evidence under the governing standard. The Court should therefore hold Defendants' treatment of this criterion unlawful and grant appropriate relief under the APA.

**COUNT II: Denial of "High Remuneration" Criterion**

**Agency Action Taken in Violation of 5 U.S.C. § 706(2)(A), (C)**
**Relating to the Criterion Under 8 C.F.R. § 204.5(h)(3)(ix)**

111. Plaintiff incorporates the allegations in Paragraphs 1 through 110 of this Complaint as if fully restated here.

112. USCIS's decision denying Mr. Nanda's immigrant visa petition constitutes a final agency action and is reviewable under the APA. See 5 U.S.C. §§ 704, 706(2).

113. USCIS's decision denying Mr. Nanda's petition is inconsistent with the APA. Specifically, USCIS's determination that Mr. Nanda did not satisfy the high-

salary-or-remuneration criterion under 8 C.F.R. § 204.5(h)(3)(ix) is arbitrary and capricious, contrary to law, and unsupported by reasoned decision-making.

114. Under 8 C.F.R. § 204.5(h)(3)(ix), the high-remuneration criterion is met where the petitioner demonstrates that he "has commanded a high salary or other significantly high remuneration for services, in relation to others in the field." The regulation requires a comparative inquiry. It does not prescribe a single mandatory dataset, a single approved salary survey, or a rigid evidentiary formula that a petitioner must follow to prove that his compensation is high relative to others in the field.

115. Mr. Nanda submitted substantial documentary evidence showing that he commanded high remuneration in relation to others in his field. His 2023 Form W-2 from Partners Group reports $389,355.22 in wages, tips, and other compensation. He paired that earnings evidence with comparative wage data from the Bureau of Labor Statistics, the Office of Foreign Labor Certification, CareerOneStop, and PayScale. Those sources supplied national and regional upper-end benchmarks. His reported compensation exceeded the Denver-area Level IV wage for Financial Managers ($229,216), the highest of OFLC's four wage levels, by approximately 70%, and exceeded CareerOneStop's local high-wage benchmark of $239,200 by approximately 63%.

116. Despite this evidence, Defendants concluded that "the criterion has not been met because the evidence does not establish that the petitioner's salary or remuneration is high relative to others working in the field." Exhibit A at 8. USCIS

reasoned only that Mr. Nanda's "2023 W2 and salary data from various online resources are not the sole indicator" for determining whether his remuneration exceeded that of others working in similar fields.

117. That explanation did not meaningfully address the comparative evidence Mr. Nanda submitted. USCIS identified no defect in the occupational classifications, geographic benchmarks, wage levels, or methodologies used, and did not explain why the multiple national and regional comparisons failed to show high remuneration relative to others in the field. Its statement that those sources were not the "sole indicator" likewise did not identify what material evidence or consideration was missing.

118. The record supplied both sides of the comparison contemplated by the regulation: Mr. Nanda's W-2 established what he actually earned, while multiple wage datasets showed what professionals in comparable roles earned nationally and regionally. USCIS did not meaningfully assess whether that evidence, considered together, established high remuneration by a preponderance of the evidence.

119. Defendants' decision that Mr. Nanda did not establish that he commanded a high salary or other significantly high remuneration in relation to others in the field under 8 C.F.R. § 204.5(h)(3)(ix) should therefore be set aside as arbitrary and capricious and contrary to law. *See* 5 U.S.C. § 706(2)(A), (C). Mr. Nanda submitted a 2023 W-2 reporting $389,355.22 in wages together with multiple national and regional compensation benchmarks.

120. USCIS did not provide a reasoned explanation for rejecting that comparative showing. The Court should therefore hold Defendants' treatment of this criterion unlawful and grant appropriate relief under the APA.

**COUNT III: Denial of "Original Contributions of Major Significance (OCMS)" Criterion**

**Agency Action Taken in Violation of 5 U.S.C. § 706(2)(A), (C) Relating to the Criterion Under 8 C.F.R. § 204.5(h)(3)(v)**

121. Plaintiff incorporates the allegations in Paragraphs 1 through 120 of this Complaint as if fully restated here.

122. USCIS's decision denying Mr. Nanda's immigrant visa petition constitutes a final agency action and is reviewable under the APA. *See* 5 U.S.C. §§ 704, 706(2).

123. USCIS's decision denying Mr. Nanda's petition is inconsistent with the APA. Specifically, USCIS's determination that he did not satisfy the original contributions of major significance criterion under 8 C.F.R. § 204.5(h)(3)(v) is arbitrary and capricious, contrary to law, and unsupported by a reasoned evaluation of the record.

124. Under 8 C.F.R. § 204.5(h)(3)(v), the original contributions of major significance criterion is met where the petitioner demonstrates original scientific, scholarly, artistic, athletic, or business-related contributions that are of major significance in the field. The regulation does not require a petitioner to prove widespread public commentary, universal implementation, or some unstated threshold of third-party adoption, citation, or publicity. Nor does it impose a categorical corroboration rule for expert testimony.

125. USCIS's own Policy Manual expressly contemplates that this criterion may be established through detailed letters from experts in the field explaining the nature and significance of the person's contribution. The governing framework requires officers to evaluate evidence for relevance, probative value, and credibility and to assess the totality of the record. Nothing in the regulation or Policy Manual authorizes USCIS to discount otherwise probative expert evidence simply because the agency prefers a different type of corroboration or wishes to impose a heightened evidentiary standard not found in law.

126. Mr. Nanda submitted substantial evidence that he made original business-related contributions of major significance in technology investments and corporate development. His evidence centered on three major contributions: his work on Partners Group's $330 million investment in VelocityEHS, his leadership of Partners Group's $900 million-plus investment in IDERA, and his work helping create the Microsoft Connected Vehicle Platform.

127. With respect to Partners Group, Mr. Nanda submitted expert testimony from Mr. Christopher J. Russell, Partner & Manager at CWR Partners and former Managing Director at Partners Group. Mr. Russell described Mr. Nanda as an investment professional who had led due diligence on multibillion-dollar transactions and whose expertise in private equity, M&A, and strategic investments had influenced those fields. The letter provided detailed testimony from a senior industry leader with direct knowledge of Mr. Nanda's work in major private-equity transactions.

128. Mr. Russell's letter and the surrounding record specifically tied Mr. Nanda's contribution to the acquisition of VelocityEHS. The record states that Mr. Nanda "managed due diligence and investment structuring for the $330 million acquisition of VelocityEHS, a global leader in AI-based employee health and safety software." Mr. Russell further explained that Mr. Nanda "pioneered an innovative approach to due diligence, combining insights from external consultants with unique intelligence gathered from current Partners Group portfolio companies, . . . as well as direct interactions with competitors and former employees." According to Mr. Russell, this methodology set "a new standard for such processes at Partners Group and more broadly in the private equity industry" and positioned Partners Group favorably against competing private-equity bidders.

129. That evidence squarely addressed both originality and major significance. Mr. Nanda did not merely participate in a routine investment process. The record attributed to him a new diligence methodology that Mr. Russell stated set a new standard at Partners Group and more broadly in private equity, and that materially assisted the firm in pursuing a $330 million transaction. Additionally, this transaction and subsequent growth initiatives enabled VelocityEHS to expand its role as a leading provider advanced regulatory compliance, risk reduction, and operational efficiency software solutions to over 18,000 customers worldwide across critical sectors such as manufacturing, food and beverage, pharmaceuticals, and chemicals.

130. The record separately documented Mr. Nanda's leadership of Partners Group's $900 million-plus investment in IDERA, which valued the company at more than $3 billion and was the firm's largest software investment to date. Mr. Russell explained that Mr. Nanda guided a cross-functional diligence process spanning technology trends, competition, product strategy, sales models, and financial performance. Mr. Nanda also developed a sourcing approach that helped Partners Group move ahead of competing bidders, and spearheaded a post-acquisition metrics dashboard used to guide product investment.

131. Mr. Nanda likewise submitted detailed expert evidence from Mr. Jordan Usdan, Senior Director, Strategy & Innovation, Office of the CTO at Microsoft. Mr. Usdan stated that Mr. Nanda "drove the creation of the Microsoft Connected Vehicle Platform (MCVP), a first-of-its-kind platform that empowers automakers to compete effectively against major technology players."

132. The record describes MCVP as "a suite of services built into the Microsoft Azure cloud, designed for automakers to create custom connected driving experiences," and explains that the project was "imperative to Microsoft's diversification of its cloud-based computing capabilities." Mr. Nanda's "proprietary analysis of market dynamics, emerging tech trends, and competitor positioning placed Microsoft ahead of formidable rivals such as Google, Apple, and Uber."

133. The evidence also showed concrete significance. The record states that Mr. Nanda's contributions to MCVP "helped secure $2 billion in projected revenue opportunities and strengthened the U.S. automotive technology ecosystem." Mr.

Usdan further explained that Mr. Nanda's work helped shape "Microsoft's approach to competitive strategy and Microsoft's cloud offerings, including its connected vehicle platform." The record also ties Mr. Nanda's work to Microsoft's partnership with TomTom, which "ultimately allowed Microsoft to offer a superior cloud-based mapping service, setting a new standard in the industry and providing a competitive edge against other major players." The evidence thus linked Mr. Nanda's work to product strategy, competitive positioning, and substantial projected business outcomes.

134. Despite this extensive evidence, USCIS concluded that Mr. Nanda did not satisfy the OCMS criterion. In doing so, USCIS applied a heightened standard not found in 8 C.F.R. § 204.5(h)(3)(v). As reflected in the denial, USCIS stated that "letters of support alone generally may not be sufficient to meet this criteria [sic]," that the significance of Mr. Nanda's work "must be demonstrated by preexisting, independent, and objective evidence," and that such letters cannot serve as the "cornerstone" of the claim. Neither the regulation nor the Policy Manual imposes a categorical rule requiring expert letters to be supported by "preexisting, independent, and objective" evidence before they may be credited.

135. USCIS's reasoning was especially arbitrary because the record did contain corroboration beyond the principal employer letters. It included documentary evidence concerning the VelocityEHS and IDERA investments at Partners Group and the Microsoft Connected Vehicle Platform (MCVP), testimonial evidence from Mr. Angelos and Mr. Magdon-Ismail, and independent media coverage discussing Mr.

Nanda's work on VelocityEHS and MCVP. USCIS did not explain why those materials failed to corroborate the testimony or identify any credibility defect in the letters.

136. USCIS also appears to have imported extra-regulatory expectations into the OCMS inquiry, faulting Mr. Nanda for not showing the sort of widespread public commentary, implementation by others, or external validation that the agency preferred. But § 204.5(h)(3)(v) requires original contributions of major significance in the field. In business, private equity, and corporate strategy, significance may be demonstrated through high-value transactions, market-shaping strategic initiatives, competitive positioning, product commercialization, and enterprise-level economic consequences. USCIS failed to evaluate Mr. Nanda's evidence in light of how significance is demonstrated in his field.

137. Rather than evaluate the evidence as a whole, USCIS fragmented the record. The letters from Mr. Russell, Mr. Usdan, Mr. Angelos, and Mr. Magdon-Ismail explained the originality and significance of specific contributions, while the documentary exhibits and media coverage corroborated the scale and commercial importance of the underlying work. USCIS identified no contradiction, unreliability, or bias that would justify disregarding that evidence. Instead, it substituted a categorical preference for other forms of corroboration for the required case-specific evaluation.

138. Defendants' conclusion that Mr. Nanda failed to establish original contributions of major significance under 8 C.F.R. § 204.5(h)(3)(v) should accordingly

be set aside as arbitrary and capricious, contrary to law, and based on an evidentiary standard not found in the regulation. See 5 U.S.C. § 706(2)(A), (C). Mr. Nanda submitted detailed expert testimony together with documentary evidence corroborating the nature, scale, and significance of his contributions. USCIS neither identified a credibility defect in that evidence nor meaningfully evaluated it under the regulatory standard. The Court should therefore hold that Defendants' treatment of this criterion was unlawful and grant appropriate relief under the APA.

**COUNT IV: Denial of the Final Merits Determination**

**Agency Action Taken in Violation of 5 U.S.C. § 706(2)(A), (C)**

139. Plaintiff incorporates the allegations in Paragraphs 1 through 138 of this Complaint as if fully restated here.

140. USCIS's decision denying Mr. Nanda's immigrant visa petition constitutes a final agency action and is reviewable under the APA. *See* 5 U.S.C. §§ 704, 706(2).

141. USCIS's decision denying Mr. Nanda's petition is inconsistent with the APA. Specifically, the final merits determination was applied here in an arbitrary and capricious manner, and applied an evidentiary burden and standard that is contrary to the INA.

142. The separate second-step final merits framework is not itself set out in the statute or regulation, but instead appears in USCIS's Policy Manual. According to the Policy Manual, an applicant must show by a preponderance of the evidence that they "have sustained national or international acclaim and that their

achievements have been recognized in the field of expertise, indicating that [they are] one of that small percentage who has risen to the very top of the field of endeavor."

143. USCIS determined that Mr. Nanda did not satisfy the Policy Manual's standard based on its limited review of the record, which focused on the four criteria it found Mr. Nanda met, relied on its erroneous evaluation of other evidence, and did not meaningfully consider Mr. Nanda's evidence of leading or critical role, high remuneration, and original contribution of major significance.

144. Defendants' final merits determination was therefore tainted by its treatment of both the four criteria it found satisfied and the evidence supporting leading or critical role, high remuneration, original contribution of major significance. Those errors carried into the final merits determination and prevented a reasoned assessment of the petition as a whole.

145. Defendants also acted contrary to law by failing to consider the evidence in the record holistically. The final merits determination requires a comprehensive review of the record. Specifically, "in the second step of the analysis, the officer should consider the petition in its entirety to determine eligibility according to the standard." USCIS Policy Manual, Vol. 6, Part F, Chapter 2:

> At this step, officers consider any potentially relevant evidence in the record, even if such evidence does not fit one of the above regulatory criteria or was not presented as comparable evidence. The officers consider all evidence in the totality. Some evidence may weigh more favorably on its own, while other evidence is more persuasive when viewed with other evidence.

Here, USCIS instead considered the evidence in isolation, suggesting that each category had to establish top-of-field status or sustained acclaim on its own.

146. The denial itself confirms that USCIS did not conduct the holistic review required by its own guidance. Although the Policy Manual requires the officer to consider the petition "in its entirety," USCIS stated that Mr. Nanda had failed to show that he was among the small percentage at the top of the field and that "the following will discuss each criterion and why they did not qualify the petitioner's position as top of the field." Exhibit A at 9. That formulation is revealing. Rather than synthesizing the full record, USCIS expressly proceeded criterion by criterion, repeatedly asking whether individual categories themselves established top-of-field status. That is in tension with the comprehensive final-merits review the Policy Manual describes.

147. USCIS also misapplied the governing burden of proof. Under *Matter of Chawathe*, 25 I. & N. Dec. 369 (AAO 2010), a petitioner is simply required to establish eligibility by a preponderance of the evidence. Here, USCIS's demands for broader notoriety, wide attention from the field, unusual influence beyond the organizational level, and other heightened markers effectively imposed a more exacting burden that cannot be reconciled with the preponderance standard or the text of the governing regulation.

148. The final merits determination was also internally inconsistent. USCIS recognized that Mr. Nanda met four criteria: membership, published material, judging, and authorship. Yet it faulted Mr. Nanda for not having documented memberships, published material, judging, and authorship sufficient to show sustained acclaim. USCIS may consider the weight of accepted evidence at final

merits, but it must do so consistently and explain why evidence it expressly found sufficient under four criteria carried insufficient weight in the overall analysis. The denial's contradictory wording further undermines confidence that USCIS engaged in reasoned review of the record.

149. The denial further shows that USCIS imposed specific recency requirements not found in the governing authorities. In the published-material discussion, USCIS reasoned that Mr. Nanda had not shown he continued to maintain acclaim by being featured in professional publications or major media "in recent times." In the judging discussion, USCIS faulted Mr. Nanda for not having participated in or been invited to "recent" judging events or recent peer-review activities. In the authorship discussion, USCIS faulted Mr. Nanda for not authoring publications "in the current year of 2025" in order to maintain national or international acclaim and remain relevant in the field. Although recency may be relevant to whether acclaim has been sustained, neither the statute, regulation, nor Policy Manual establishes a current-year authorship requirement, a "recent judging" requirement, or a requirement that qualifying media coverage occur within an unspecified period of "recent times." USCIS thus converted a permissible inquiry into sustained acclaim into additional temporal prerequisites that the governing authorities do not prescribe.

150. USCIS's recency reasoning also failed to account for the timing of the evidence before it. Mr. Nanda submitted press coverage published as recently as December 2024, less than four months before he filed his petition. His petition and

RFE response also documented judging activity in March and April 2025. Yet USCIS faulted him for lacking media coverage "in recent times" and "recent" judging activity without explaining why that evidence did not demonstrate continued professional recognition. These factual omissions compound the separate legal error in USCIS's insistence on authorship "in the current year of 2025," a requirement found nowhere in the governing regulation.

151. USCIS also improperly used allegedly unsatisfied criteria as affirmative reasons to deny final merits, rather than weighing the underlying evidence in the totality of the record. This is particularly clear with respect to original contributions of major significance, leading or critical role, and high salary. The denial does not meaningfully assess the probative force of the evidence underlying those criteria in the overall extraordinary-ability analysis. Instead, it largely restates that the criteria were not met and appears to use those findings as negative considerations at final merits. Even if a criterion were not formally satisfied, the underlying evidence remains relevant to the final-merits inquiry and must be considered to the extent probative in the final-merits determination. And where the criterion-level analyses themselves were infected by legal error, USCIS could not lawfully convert those flawed findings into additional reasons for denial at step two.

152. USCIS also failed to evaluate the evidence in context and as mutually reinforcing. Mr. Nanda's record included evidence of selective memberships, published material, judging activity, scholarly authorship, original contributions, leading or critical roles, and remuneration exceeding upper-end market benchmarks.

The Policy Manual contemplates that some evidence may be persuasive on its own while other evidence gains force when viewed together. Yet USCIS segmented those categories rather than meaningfully addressing their cumulative force.

153. USCIS's treatment of Mr. Nanda's Forbes Finance Council membership illustrates the problem. The denial discounted the membership because it was not subject to revocation or periodic recertification. But Forbes Finance Council membership is annual and must be renewed. The RFE response expressly identified the Forbes Councils Terms of Service as part of the evidence submitted on membership, not to mention that Mr. Nanda submitted recent evidence from 2024 and 2025. In any event, neither the statute, regulation, nor Policy Manual requires periodic recertification of an association membership as a condition of sustained acclaim.

154. USCIS also failed to meaningfully engage with the substantial evidence supporting original contributions of major significance, leading or critical role, and high remuneration, all of which remained relevant to final merits regardless of whether USCIS formally counted those criteria. The record included detailed evidence concerning MCVP, the IDERA and VelocityEHS investments, Mr. Nanda's strategic and transactional roles at Microsoft, Partners Group, Revalize, and Advantive, as well as a 2023 W-2 reporting $389,355.22 in compensation together with multiple upper-end compensation benchmarks. USCIS did not meaningfully weigh that evidence in the aggregate.

155. Viewed as a whole, the record readily satisfied the final-merits standard as Mr. Nanda has achieved sustained national and international acclaim and his achievements have been recognized in the field of Technology Investments and Corporate Development.

156. **Sustained National/International Acclaim:** Over more than a decade from 2013 to 2025, Mr. Nanda progressed from software engineering and corporate development & strategy roles at Microsoft to technology private-equity investing at Partners Group and senior corporate-development roles at Revalize and Advantive. In these roles, Mr. Nanda showed a consistent pattern of high achievement and drove large-scale investments, acquisitions, and strategic initiatives that have positively shaped major markets such as employee health & safety software and connected vehicles. The Forbes Finance Council has admitted him as a member. Iqram Magdon-Ismail, co-founder of Venmo, affirmed that "[t]he selection committee only invites highly respected leaders in finance to join the Council." In addition, the record separately documented his judging, authorship, and remuneration substantially above upper end market benchmarks. USCIS itself credited four articles about him and his work which appeared in major media such as MSN (500 million monthly visits).

157. **Original Contributions:** Mr. Nanda has made original contributions that, by the account of the executives who worked with him, independent experts, and major publications, set the standards at organizations such as Partners Group and Microsoft and in the broader technology and investment industries. Christopher

Russell, a former Managing Director of Partners Group, who worked directly with Mr. Nanda, described his leadership in the VelocityEHS investment diligence process as setting "a new standard for such processes at Partners Group and more broadly in the private equity industry." *See supra* Count III; *see also supra* Factual Allegations.

158. **Leadership and Role at the Top of the Field:** Mr. Nanda's standing is shown by the responsibility that leading organizations have placed in him. Partners Group manages more than $150 billion and ranks among the ten largest publicly traded private markets firms by market capitalization. As a Technology Investment Professional on its Direct Private Equity team, Mr. Nanda was responsible for deploying more than $1.5 billion of equity in investments, among them VelocityEHS, IDERA, and Archer. Oliver Staehelin, the Chief Corporate Development Officer who later recruited him to Revalize and Advantive and to whom he reports, calls him "one of the principal architects of Advantive's ambitious expansion strategy."

159. **Comparison to Peers:** The record compares Mr. Nanda's pay with published wage data for Financial Managers (SOC 11-3031), the occupational category this petition uses. His cash compensation at Partners Group in 2023 was $389,355.22. The Bureau of Labor Statistics publishes a national 90th percentile wage for the occupation of $208,000 or more. The Department of Labor's Level 4 wage for the occupation in the Denver metropolitan area is $229,216, and the highest wage CareerOneStop publishes for his locality is $239,200 or more. Mr. Nanda's compensation exceeded each of those published thresholds by more than 60 percent.

It was more than twice the 90th percentile of total pay that PayScale reports for senior financial managers, both nationally ($177,000) and in Denver ($155,000). Those who know the field also place him above his peers. Mr. Russell, who oversaw transactions with more than $25 billion in cumulative enterprise value at Partners Group, places him "at the pinnacle of his profession," and Mr. Angelos concludes that he "has certainly reached the pinnacle of his field."

160. USCIS never explained why this combined record failed to demonstrate sustained acclaim or top-of-field standing.

161. Defendants' analysis of the second step was also replete with contradictory statements. That includes the adjudicating officer's claims that Mr. Nanda had "not documented [his] membership in associations, ha[d] not published material about [himself] in professional or major trade publications or other major media, did not participate either individually or on a panel as a judge of the work of others in the same field, ha[d] not made original contributions, ha[d] not provided authorship of scholarly articles in the field, ha[d] not had major impact on the organization he works for in a leading or critical role, and ha[d] not demonstrated that he has commanded high salary or other significantly high remuneration for services in relation to others in the field." Defendant ignored the officer's own findings by claiming that the criteria that were already deemed satisfied were in fact not documented on the record, while also using this error as a reason to claim Mr. Nanda had not shown sustained acclaim.

162. This reasoning is contrary to the governing regulations and reflects an arbitrary, capricious, and legally untenable adjudication. Under the applicable framework, once USCIS has determined that the submitted evidence satisfies specific evidentiary criteria, the agency must then conduct a reasoned final merits determination based on the record as a whole, not simply disregard the very evidence it already accepted. Defendant's position is therefore not merely inconsistent, but irrational, as USCIS simultaneously acknowledged that Mr. Nanda submitted evidence sufficient to satisfy multiple regulatory criteria, while asserting in the final merits analysis that such evidence was never documented at all. That contradiction reflects a fundamental failure of reasoned decision-making demonstrating that the agency failed to meaningfully consider the evidence in this case and instead issued a decision untethered from the administrative record. Indeed, the inconsistency indicates that USCIS overlooked material evidence or relied on boilerplate reasoning disconnected from Mr. Nanda's submission.

163. Defendants' final merits determination therefore applied additional requirements not found in the governing authorities, failed to assess the record cumulatively, and relied on criterion-level errors and internal contradictions that undermine the denial.

164. The final merits determination is also inconsistent with Defendants' application of the same statutory provision under the Gold Card Program, which permits Gold Card applicants to demonstrate EB-1A eligibility based on a one-time payment of $1 million to the Department of Commerce. Even if the Gold Card

payment satisfies three of the regulatory criteria, there is no consistent way to conduct the final merits determination to Gold Card applicants and Mr. Nanda that would justify a grant of a Gold Card applicant's petition and denial of Mr. Nanda's application. Gold Card applicants are not required to identify a field of endeavor or produce evidence that they are among a small percentage that has risen to the top of that field of endeavor. Nor are Gold Card applicants required to show that the payment was the result of work in that field of endeavor over a career, as opposed to short term windfall or one-time accomplishment. It is arbitrary and capricious to hold non-Gold Card applicants to a higher standard for success and sustained acclaim than even what is laid out in USCIS' own stated policies.

165. The final merits determination also cannot be justified as a freestanding exercise of agency discretion. USCIS Policy Alert PA-2025-16 states that discretionary analysis in employment-based immigrant-petition adjudications is limited to National Interest Waiver cases under INA § 203(b)(2)(B). Although USCIS may weigh evidence in determining EB-1A eligibility, it may not use final-merits review as an uncodified discretionary veto after applying the governing eligibility standards.

166. Defendants' final merits determination should therefore be set aside as arbitrary and capricious, and contrary to law. *See* 5 U.S.C. § 706(2)(A), (C). USCIS applied the final-merits framework here through extra-textual requirements and without a reasoned cumulative assessment of Mr. Nanda's evidence. The Court should therefore set aside the denial and grant appropriate relief under the APA.

**COUNT V: Unlawful Adoption of the Final Merits Determination**

**Agency Action Taken in Violation of 5 U.S.C. § 706(2)(A), (C)**

167. Plaintiff incorporates the previous allegations in this Complaint as if fully restated here.

168. USCIS's decision denying Mr. Nanda's immigrant visa petition constitutes a final agency action and is reviewable under the APA. *See* 5 U.S.C. §§ 704, 706(2).

169. USCIS's decision denying Mr. Nanda's petition is inconsistent with the APA. Specifically, USCIS adopted the final-merits framework without adequately acknowledging or explaining its change in position, and the framework applies an evidentiary burden and standard that is contrary to the INA.

170. The separate final-merits step is not itself set out in the statute or regulation; USCIS formalized that framework in subregulatory guidance and now sets it out in the Policy Manual. According to the Policy Manual, an applicant must show by a preponderance of the evidence that they "have sustained national or international acclaim and that their achievements have been recognized in the field of expertise, indicating that [they are] one of that small percentage who has risen to the very top of the field of endeavor."

171. The 2010 USCIS memorandum PM-602-0005.1, "Evaluation of Evidence Submitted with Certain Form I-140 Petitions; Revisions to the Adjudicator's Field Manual (AFM) Chapter 22.2," formalizing the *Kazarian* two-step process in the AFM,

is unlawful under 5 U.S.C. § 706(2)(A) because it was adopted in an arbitrary and capricious manner and is contrary to law.

172. In adopting the 2010 memorandum and the changes to the Policy Manual, the agency changed the single-step adjudicative framework that had been in place for approximately twenty years.

173. Agencies may revise their existing policies, but only if they offer a reasoned explanation for doing so. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016). At a minimum, an agency must acknowledge that it is departing from a prior position and articulate sound reasons for adopting the new policy. Here, the agency did neither.

174. In addition, the 2010 memorandum and Policy Manual cannot lawfully be applied to impose eligibility requirements beyond those contained in the INA and 8 C.F.R. § 204.5(h). 5 U.S.C. § 706(2). The statute requires sustained national or international acclaim and that the applicant's "achievements have been recognized in the field through extensive documentation." 8 U.S.C. § 1153(b)(1)(A)(i).

175. Although 8 C.F.R. § 204.5(h)(2) defines extraordinary ability as expertise indicating that the individual is "one of that small percentage who have risen to the very top of the field of endeavor," neither the INA nor the regulation authorizes USCIS to convert that standard into additional, freestanding eligibility requirements untethered to the governing text.

176. The Gold Card Executive Order 14351 and USCIS's implementation of the EO confirm this point: USCIS is not conducting final merits determinations

before approving EB-1As for Gold Card applicants. Exhibit B. That materially different adjudicatory approach undermines Defendants' position that the additional final-merits requirements applied to Mr. Nanda are compelled by the statute.

177. The final merits determination is also inconsistent with the Defendants' application of the same statutory provision under the Gold Card Program, which requires USCIS to treat a qualifying $1 million gift as evidence of eligibility under 8 U.S.C. § 1153(b)(1)(A). EO 14351 § 2(b). USCIS's implementation materials go further by directing materially different adjudicatory treatment for Gold Card EB-1A petitions. Exhibit B. Applying heightened final-merits requirements to Mr. Nanda while dispensing with those same requirements in the Gold Card process further underscores the inconsistency in Defendants' interpretation of the same statutory provision.

178. The final merits determination also lacks any clear standards. It creates an invisible standard for petitioners to meet and affords USCIS unbounded discretion to deny petitions. USCIS Policy Alert PA-2025-16 (dated August 19, 2025) updated the Policy Manual to specify that discretionary review in employment-based immigrant petitions is limited exclusively to National Interest Waiver cases under INA 203(b)(2)(B). Volume 1, Part E, Chapter 8 (1 USCIS-PM E.8) confirms this restriction through its applicability table, which designates EB-1A petitions as non-discretionary (footnote 20 explicitly carving out only NIW as the exception). Although USCIS may weigh evidence in determining EB-1A eligibility, the final-merits

framework cannot operate as a freestanding discretionary veto after the governing eligibility standards are applied.

179. The final merits determination, and the agency's erroneous application thereof, should be set aside as arbitrary and capricious, and contrary to the statute. *See* 5 U.S.C. § 706(2)(A), (C); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). Under *Loper Bright*, this Court owes no *Chevron* deference to USCIS's interpretation of 8 U.S.C. § 1153(b)(1)(A) and must independently determine whether the agency's construction of the statute is correct. The Court should find that the final merits determination applied by USCIS here is arbitrary and capricious and therefore invalid, that the standards imposed by USCIS in the denial are contrary to law, and that the petition should be granted.

**COUNT VI: Notice and Comment**

**Failure to Engage in Required Notice-and-Comment Rulemaking (APA, 5 U.S.C. §§ 553, 706(2)(D))**

180. Plaintiff incorporates the allegations in this Complaint as if fully restated here.

181. USCIS's adoption and application to Mr. Nanda of the final merits determination and other heightened legal and evidentiary standards for satisfying the regulatory criteria without notice and comment constitute final agency action. *See* 5 U.S.C. § 704.

182. 5 U.S.C. § 706(2)(D) states that the court shall "hold unlawful and set aside" agency action taken "without observance of procedure required by law."

183. The APA requires notice-and-comment rulemaking for legislative rules. 5 U.S.C. § 553. Before issuing such a rule, an agency generally must publish notice of proposed rulemaking in the Federal Register identifying the legal authority for the rule and the terms or substance of the proposal, provide interested persons an opportunity to submit comments, and, upon adopting the rule, incorporate a concise general statement of its basis and purpose. *Id.* § 553(b)–(c).

184. The APA also presumptively requires that a substantive rule be published "not less than 30 days before its effective date." *Id.* § 553(d). The challenged standards are legislative rather than merely interpretive or procedural, and therefore do not fall within § 553(b)(A)'s exemption.

185. The regulation promulgated in 1991 contains no separate "final merits determination" stage. USCIS did not formalize the now-mandatory two-step framework as a distinct adjudicative process until 2010.

186. In 1995, legacy INS initiated notice-and-comment rulemaking, RIN 1115-AD55, to revise the regulations governing employment-based immigrant petitions, including 8 C.F.R. § 204.5. The Unified Agenda classified the proposed rule as "Substantive, Nonsignificant." That rulemaking never resulted in a final rule establishing a separate final-merits stage, leaving the final merits determination stage absent from the codified regulation.

187. USCIS abruptly changed its formal adjudicative framework in 2010 through a policy memorandum issued outside § 553 notice-and-comment rulemaking, responding to the Ninth Circuit's decision in *Kazarian v. USCIS*, 596 F.3d 1115 (9th

Cir. 2010), and institutionalizing a mandatory two-step framework with a final merits determination atop the criteria.

188. This two-step approach was adopted with no notice-and-comment rulemaking; the 2010 memorandum was not promulgated through § 553 procedures, was not codified in the C.F.R., and did not amend § 204.5(h). Instead, USCIS invoked general authority under 8 U.S.C. § 1103(a) and *Kazarian*, bypassing the process it had deemed necessary in 1995.

189. Similarly, Defendants adopted and applied heightened standards for the regulatory criteria without subjecting these new standards to notice-and-comment rulemaking. These include: (1) requiring the major significance of original contributions to be demonstrated by "preexisting, independent, and objective evidence" and discounting expert letters absent the agency's preferred corroboration, Exhibit A at 6; (2) requiring qualifying memberships to be subject to revocation, periodic verification, or recertification to demonstrate continued acclaim; (3) requiring published material to have appeared "in recent times"; (4) requiring "recent" judging or peer-review activity; (5) requiring scholarly authorship "in the current year of 2025"; and (6) requiring, in evaluating original contributions at final merits, evidence such as "widespread public commentary," widespread citation, or implementation by others. These requirements do not appear in the governing regulation, and Defendants applied them as additional conditions on Mr. Nanda's eligibility.

190. These changes and additional requirements are legislative, not merely interpretative, because they do more than specify the sequence in which USCIS evaluates evidence. As applied to Mr. Nanda, they impose additional substantive conditions not found in § 204.5(h), including particular corroboration and temporal requirements that determine eligibility. They were never adopted through notice-and-comment rulemaking and remain uncodified. Because the governing regulations contain no such additional requirements, Defendants' imposition of them constitutes agency action taken without observance of required procedure and in excess of delegated authority. 5 U.S.C. § 706(2)(C), (D). The decision should therefore be set aside under § 706.

## PRAYER FOR RELIEF

Based on the above allegations and related causes of action, Plaintiff requests an order from this Court:

A. Taking jurisdiction over this civil action;

B. Declaring unlawful and setting aside USCIS's decision denying Mr. Nanda's immigrant visa petition for classification as a first preference employment-based immigrant of extraordinary ability under 8 U.S.C. § 1153(b)(1)(A);

C. Entering judgment against Defendants based on USCIS's issuing a final agency action contrary to the Immigration and Nationality Act, as amended, the implementing regulations at 8 C.F.R. § 204.5(h), and the Administrative Procedure Act, 5 U.S.C. § 706(2);

D. Awarding any other or further relief that the Court deems just, equitable, or proper.

Dated: October 27, 2026

Respectfully submitted,

/s/ ______________________
Patrick Glen (PA 200393)
Colombo & Hurd, PL
301 E. Pine St. #450
Orlando, FL 32801
(407) 478-1111
pglen@colombohurd.com

David Kim* (IL 6318223)
Colombo & Hurd Pl
301 E. Pine Street, Ste. 450
Orlando, FL 32801
(407) 204-1219
dkim@colombohurd.com

**Pro Hac Vice Application Forthcoming*